## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KARIM RAZZAQ,                    *
                Petitioner,
      v.                    *   CIVIL ACTION NO. PJM-08-1331

JOHN A. ROWLEY, et al.,        *
                Respondents.
                    ***

### MEMORANDUM OPINION

Now before the Court is an original and supplemental Petition for habeas corpus relief filed by Karim Razzaq (Paper Nos. 1 & 4); Respondents' Answers (Paper Nos. 11 & 29); and Petitioner's Replies thereto. Paper Nos. 17 & 31. After review of these documents, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*. For the reasons to follow, the Petition will be denied and dismissed with prejudice.

### Factual History

The facts adduced at trial, as described by the Court of Special Appeals of Maryland, are as follows:

> On February 9, 2002, Craig Pope was found shot to death in his Baltimore City home. Two men were implicated in the shooting: Xavier Evans and appellant. Evans and Razzaq had originally visited Pope to buy drugs. After they left the house, they discussed the idea of returning to rob and shoot Pope. Unfortunately for Pope, they executed their plan, and him.

> On March 26, 2002, a grand jury sitting in the Circuit Court for Baltimore City returned four indictments charging Razzaq and Evans each with a variety of offenses arising out of the murder and robbery of Pope. Evans, for his part, pleaded guilty to first degree murder. In consideration of his plea, he agreed to testify against Razzaq in exchange for a life sentence, with all but 20 years suspended. We shall later review Evans's testimony as it pertains to our discussion of the lack of a jury instruction on the offenses of conspiracy.

Razzaq went to trial on June 18, 2003, and on June 23 the jury returned guilty verdicts on all counts.  His motion for a new trial was denied, and he was sentenced on August 28, 2003.  This timely appeal followed.

Paper No. 11, Ex. 11 at pp. 2-3.

The Court of Special Appeals opinion provided additional facts as adduced at trial:

Kenny Hopewell had known Pope, the victim, for 20 years.  He visited Pope on the day of the murder, and saw two men at the Pope residence, one of whom was Razzaq. That evening, Hopewell went out with Razzaq to a bar, only to return to Pope's home about 15 minutes later.  Hopewell then left with his girlfriend at about 8:00 p.m. to go to the movies, leaving Pope in the company of Razzaq and Evans. Hopewell did not return to Pope's house that evening and learned about the shooting the next morning from police.  He said that Razzaq possessed a handgun.

Erica Singletary, Pope's girlfriend, testified that two men, one later identified as Razzaq, visited Pope on the day of the shooting.  After she left the house in the evening to attend a baby shower, Singletary called Pope to inform him that she had safely reached the party.  During this call she learned that the two visitors were still at the house.  Singletary returned to Pope's house near midnight and went around to the back to gain entry because no one answered the front door.  She noticed that a patio door was open.  Once inside, she saw Pope on the floor and called police.

Razzaq's companion that day, Evans, entered a plea in return for his testimony. Evans recalled that he and Razzaq went to Pope's house at around 10:30 a.m. to "get some ready rock." Singletary was there with Pope.   At some point in the afternoon, Hopewell showed up.   Evans recounted that he knew Hopewell from jail.

Evans testified that he and Razzaq planned to buy drugs and then rob Pope.  While Razzaq and Evans were out looking for something to eat, they discussed a plan for robbing and killing Pope.   Because he had the only handgun at that point, Evans agreed to fire the weapon.  After they returned to the house, Razzaq gave a signal and Evans shot Pope in the back of the head.  Evans removed a handgun from Pope's pocket and handed that weapon to Razzaq, who then fired two rounds into Pope. They fled through the back of the residence with money, drugs, and Pope's handgun. To exit the house, because they did not have a key, they opened the rear sliding door and kicked out the screen.  It was this scene that Erica Singletary encountered when she returned from the baby shower.  She had remarked on the stand that one would need a key to exit the house.

Paper No. 11, Ex. 11 at pp. 15-17.

## Procedural History

In 2002, Petitioner Karim Razzaq[1] was charged with several offenses related to the death of Craig Lamont Pope.[2]  Paper No. 11, Ex. 1.  Baltimore City Circuit Court Judge Alfred Nance presided over a suppression hearing and a four-day jury trial.  The jury heard the testimony of members of the Baltimore City Police Department ("BCPD"), Petitioner's co-defendant and alleged accomplice Xavier Evans and others who were at Pope's house or with Petitioner on the day of the homicide[3] and defense alibi witnesses Keith Lee and Lila Stewart.  Also introduced were the police statements of Petitioner and Xavier Evans, transportation records of Evans related to movements to and from BCPD's Homicide Division, and hotel receipts.  A Baltimore City jury found Petitioner guilty of first- and second-degree murder, various handgun charges, conspiracy to commit first-degree murder, robbery with a deadly weapon, robbery, first-and second-degree assault, theft over $500.00, and conspiracy to commit robbery with a deadly weapon.  *Id.*, Exs. 2-6.  Prior to sentencing, Judge Nance heard and denied a motion for new trial and sentenced Petitioner to life plus 20 years imprisonment.  *Id.*, Ex. 7.

On direct appeal Petitioner raised the following grounds: (1) the jury was not properly instructed on conspiracy charges associated with first-degree murder and robbery with a dangerous weapon; (2) if the conspiracy convictions are not reversed, the separate conviction and sentence for conspiracy to commit robbery with a dangerous or deadly weapon must be vacated because the state

---

[1]     Petitioner legally changed his name to Karim Razzaq.  His birth name was Marcus Martin.

[2]     Craig Pope suffered from gunshot wounds to his head, neck, and upper torso which injured his jugular vein and left lung, causing extensive bleeding in the left lung.  These traumas caused his death. Paper No. 11, Ex. 4, Tr. at 52-53.

[3]     Kenneth Hopewell and Erica Singletary (a.k.a. "White Girl") were at Pope's house on the day of the homicide and testified as to the activities of the victim and others on that day.  They identified Petitioner as one of the individuals who was at the house.

proved one agreement between Petitioner and accomplice Xavier Evans; (3) the trial court erred in

denying Petitioner's motion for mistrial after State's Attorney Phillip Pickus referenced facts not in

evidence; and (4) the trial court erred when it failed to give an alibi witness instruction. Paper No.

1, Exs. 8-10. The Court of Special Appeals of Maryland vacated Petitioner's conviction for

conspiracy to commit armed robbery on the ground that he could be convicted of only one

conspiracy given the facts of the case but otherwise affirmed the convictions. *Id*., Ex. 11.

Petitioner filed a petition for writ of certiorari in the Court of Appeals of Maryland, raising

only those claims regarding trial court instructions on conspiracy counts. *Id*., Ex. 12. On February

10, 2006, the Court of Appeals of Maryland denied the petition. *Id*., Ex. 13.

On or about April 12, 2006, Petitioner initially filed for post-conviction relief in the Circuit

Court for Baltimore City. *Id*., Ex. 14. The *pro se* petition, later amended by Petitioner, alleged that:

(1) counsel John Calhoun was ineffective for failing to: develop exculpatory evidence; conduct an

adequate investigation; investigate the crime scene, state's witnesses,[4] police reports, his co-

defendant's prior inconsistent statements, and his alibi and alibi witnesses;[5] adequately prepare for

trial; tender jury instructions of an alibi; and have a piece of property (sofa) and other physical

evidence examined by defense experts, (2) State's Attorney Phillip Pickus committed prosecutorial

misconduct by knowingly using the perjured testimony of Xavier Evans[6] and making a false closing

---

[4]        Petitioner claimed that defense counsel failed to investigate the fact that the state's key
witness, Xavier Evans, was caught in a raid at "Club Andies" on the night and time in question.

[5]        Petitioner contended that trial counsel John Calhoun was advised of four witnesses,
"Club Andies" records, a police report and VHS tapes that would have corroborated his alibi and failed to
subpoena the witnesses or items. Paper No. 11, Ex. 14.

[6]        As an ancillary ground to this prosecutorial abuse claim, Petitioner seemingly asserted that
homicide detectives knowingly used false statements given to them by Xavier Evans to obtain an arrest

argument statement regarding Petitioner offering an "abduction" report;  (3) there was insufficient evidence to convict; and (4) Judge Nance did not safeguard Petitioner's fundamental rights as the judge failed to intervene in trial counsel's failures and  prosecutorial misconduct and did not give alibi instructions.  Paper No. 11, Exs. 14-15.  The petition was further amended by counsel to allege that defense attorney John Calhoun was ineffective for failing to: (1) object to the absence of a jury instruction on the crime of conspiracy and alibi defense; (2) object properly to inappropriate impeachment of defense witness Keith Lee; and (3) impeach, present evidence, and argue that there were discrepancies between the crime scene/physical evidence and the testimony. *Id*., Ex. 17.   On December 7[7] & 8, 2006 and February 5, 2007, counseled post-conviction hearings were held in the Circuit Court for Baltimore City before Judge Albert J. Matricciani.[8] *Id*., Exs. 18 & 19;  Paper No. 29.   Post-conviction relief was denied on May 11, 2007. *Id*., Ex. 20.   Petitioner's application for leave to appeal was denied by the Court of Special Appeals of Maryland on March 6, 2008.  Paper No. 11, Exs. 21-22.

---

warrant, and these statements were used by State's Attorney Pickus who placed Evans on the witness stand and "coached him as to what to say."  Paper No. 11, Ex. 14.

[7]        The four- minute post-conviction hearing of December 7, 2006, involved no formal testimony or argument.  Rather, a discussion ensued about postponing the case to the following day.  Paper No. 29.

[8]         Judge Matricciani culled the various petitions and hearing arguments together and concluded that the following grounds were ripe for consideration:  (1) ineffective assistance related to counsel's failure to (a) investigate the crime scene, witnesses, and generally prepare for trial; (b) investigate the state's witnesses and to impeach them for testimony that was inaccurate or false; (c) request an alibi defense jury instruction; (d) object to the absence of a jury instruction on conspiracy; (e) preserve the record for appeal; and (e) object to inappropriate impeachment of defense witness Keith Lee; (2) prosecutorial misconduct for: (a) presenting perjured testimony of Xavier Evans; (b) presenting insufficient evidence to sustain a conviction of the crimes; (c) wrongfully stating in closing argument that Petitioner had made a fabricated abduction report when such evidence was not supported by the record; and (d) knowingly using false statements to obtain an arrest warrant for Petitioner; and (3) judicial misconduct for Judge Nance's failure to provide an alibi instruction to the jury and to provide a curative instruction.  Paper No. 11, Ex. 20 at 2-3.

The instant Petition raises the following grounds:

A.  Trial counsel was ineffective by failing to:

    1.  object to inappropriate impeachment of a defense witness;

    2.  request a jury instruction on an alibi defense and conspiracy;

    3.  preserve the record for appeal;

    4.  impeach, object to or to present evidence and/or witnesses;

    5.  present argument regarding discrepancies between the crime scene, physical evidence, and the testimony of Mr. Evans;

    6.  investigate or have a defense investigator investigate the crime scene;

    7.  interview the state's witnesses; and

    8.  inform Petitioner of a plea agreement;

B.  Prosecutorial Misconduct as the States Attorney:

    1.  knowingly used perjured and false testimony;

    2.  knowingly used false statements to obtain an arrest warrant;

    3.  inappropriately impeached a defense witness; and

    4.  made remarks not supported by the record;

C.  The evidence was insufficient to uphold the convictions; and

D.  Ineffective assistance of appellate and post-conviction counsel due to their failure to raise and preserve triable issues on appeal and to subpoena witnesses on collateral review.

Paper No. 1.[9]

## Threshold Considerations

---

[9]      A document filed and re-characterized as a Supplemental Petition raises identical grounds. Paper No. 4.

## Timeliness & Exhaustion of State Remedies

Respondents do not contend, and the Court does not find, that the Petition was filed outside the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1). Further, Petitioner no longer has any state direct review or collateral review remedies available to him with respect to the claims raised in this Court. His claims are exhausted for the purpose of federal habeas corpus review.

## Procedural Default

Before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court. *See Rose v. Lundy*, 455 U. S. 509, 521 (1982). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728 (1999); 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction proceedings. Exhaustion is not required if at the time a federal habeas corpus petition is filed the petitioner has no available state remedy. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).

The procedural default doctrine bars consideration of a claim in a petition for habeas corpus

absent a showing of cause and prejudice or actual innocence. *See Murray*, 477 U.S. at 495; *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977). Even where a petitioner fails to show cause and prejudice for a procedural default a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U. S.298, 314 (1995); *Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). The miscarriage of justice standard is directly linked to innocence. *Schlup*, 513 U.S. at 320. Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id*. at 315. The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U. S. at 496.

Respondents argues that Petitioner's Sixth Amendment claim regarding defense counsel John Calhoun's failure to inform him of a plea agreement was never raised in state court and is therefore procedurally defaulted. They further assert that in his application for leave to appeal the post-conviction decision, Petitioner did not specifically challenge counsel's failure to preserve issues for appeal. The Court has examined the state court record on appeal and collateral review and finds that the grounds were not raised.[10] Paper No. 11, Exs. 14-15, 17, & 21. Respondents further assert that that all but one of Petitioner's prosecutorial abuse claims are procedurally defaulted.

The record shows that the post-conviction court rejected Petitioner's claims that the State's Attorney knowingly used perjured and false testimony at trial, knowingly used false statements to

---

[10]     Although the Sixth Amendment ground of preservation of the record for appellate review was not raised in Petitioner's application for leave to appeal, it was generally addressed by Judge Matricciani as related to ineffective assistance claims going to Calhoun's failure to object to the absence of alibi defense and conspiracy instructions. Paper No. 11, Ex. 19, Tr. at 6-8; Ex. 20 at pp. 11-13.

obtain an arrest warrant, and conducted an inappropriate cross-examination of defense witness Keith

Lee, finding the claims procedurally barred because they were not raised at trial or on appeal. Paper

No. 11, Ex. 20 at pp. 14-15 & 17. Moreover, while the Petition raises an independent assertion that

the evidence was insufficient to support the convictions, this ground was not made on direct appeal

and was found to be procedurally barred by Judge Matricciani on post-conviction review when

raised as a prosecutorial misconduct ground. *Id.*, Ex. 20 at p. 15. Finally, Petitioner's claim that

appellate counsel was ineffective for the failure to raise and preserve triable issues on appeal was not

raised in state court and is thus procedurally defaulted.

Petitioner was given an opportunity to file a reply explaining why these claims should not be

procedurally defaulted. Paper No. 23. In so doing, he seemingly argues that there are "exceptional

circumstances" warranting review of these "unexhausted" claims, because he would be precluded

from arguing them in the future under the applicable one-year statute of limitations. Paper No. 31.

Petitioner also asserts that he satisfies the "cause" standard under *Murray* because he has been

represented by counsel at every stage of the state appeal and collateral review process and counsel

failed to satisfactorily represent him at every level of the case. He claims that counsel was asked to

litigate the "unexhausted" issues, but informed him that they were not appealable and must be

argued on post-conviction review. Petitioner therefore contends that Judge Matricciani's finding

that the issues were not properly preserved was due to counsel's failure to preserve the record.

Paper No. 31 at pp. 3-4.

Petitioner also maintains his innocence and contends that that the "many deficiencies of trial

counsel [Calhoun] rendered his trial 'fundamentally unfair.'" He contends that defense counsel

failed to preserve prosecutorial misconduct claims along with other claims of constitutional

violations and appellate counsel failed to perfect the appeal by not adding appealable issues during the appellate stage. *Id.* at pp. 5-6.

Petitioner's allegation that trial and appellate counsel rendered ineffective assistance of counsel does not constitute cause to excuse procedural default. Generally such a claim must be presented to the state court as an independent claim before it may be used to establish cause for procedural default. *See Murray v. Carrier*, 477 U.S. at 489. Further, cause for procedural default on appeal "ordinarily requires showing of some external impediment preventing counsel from constructing or raising the claim." *Murray*, 477 U.S. at 492.

The Court has reviewed Petitioner's arguments and concludes that he has failed to demonstrate cause and prejudice with regard to exhaustion of these claims. Furthermore, actual innocence is not apparent from the record. The grounds noted above are considered defaulted and shall not be addressed on the merits.

## Standard of Review

Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

  1)       resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

  2)       resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362,

405 (2000).[11] Section 2254(d) also requires federal courts to give great deference to a state court's factual findings. *See Lenz v. Washington,* 444 F. 3d 295, 299 (4th Cir. 2006). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In sum, § 2254(d) imposes a "highly deferential standard for evaluating state-court rulings" and "demands that the state-court decisions be given the benefit of the doubt." *See Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010); *see also Woodford v. Viscotti*, 537 U.S. 19, 24 (2002). With these standards in mind, the Court will address the merits of Petitioner's claims.

## Analysis of Non-Defaulted Claims

### Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a convicted defendant must demonstrate that counsel's performance (1) "fell below

---

[11]    Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (*per curiam*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002). A federal district court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly; rather, the state court application must be objectively unreasonable. *See*

11

an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant. *Id*. at 688, 692. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688. In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotations omitted). A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable. *Id*. at 690.

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

---

*Renico v. Lett*, 130 S.Ct.1855, 1862 (2010).

Petitioner claims that trial counsel Calhoun committed a number of errors. He first claims that counsel failed to object to inappropriate impeachment of a defense witness during cross-examination. Presumably, Petitioner is referring to the ineffective assistance ground involving the cross-examination of defense witness Keith Lee. The state post-conviction court heard and rejected this claim, stating that:

> In his supplemental petition, petitioner argues that during the cross examination of defense witness, Keith Lee, Mr. Calhoun failed to request that Mr. Pickus lay the proper foundation for impeaching Mr. Lee. Mr. Pickus questioned Mr. Lee as to why Mr. Lee waited several months before telling the police about the call petitioner made to Mr. Lee on the night of the murder. Petitioner states that in order to impeach a defense witness with his failure to come forward pre-trial, the State must first lay a foundation showing "a relationship between the witness and the defendant, or circumstances, such as to permit the trial court to conclude that it would have been a natural impulse on the part of the witness to come forward with exculpatory evidence." (*Davis v. State*, 344 Md. 331, 343, 344 (1996)). While petitioner's interpretation of the law is correct, there is again an insufficient basis upon which to conclude that petitioner was prejudiced as a result of this misstep.

Paper No. 11, Ex. 20 at 13-14.

Judge Matricciani's decision survives scrutiny under § 2254(d). Petitioner has failed to show how he was prejudiced by Calhoun's alleged failure to compel the prosecutor to establish that Petitioner and Keith Lee had a relationship. Lee testified as a defense witness that he had received a telephone call from Petitioner about 7:30 p.m. on the day of the homicide concerning movie schedules at a Baltimore County movie theatre. Paper No. 11, Ex. 5, Tr. at pp. 10-11. On cross-examination he testified that he had also received a telephone call from Petitioner a week after the homicide and Petitioner had told him that "somebody he knew was killed," he was being accused of committing the murder, and that he did not do it. When further questioned by the State's Attorney, Lee testified that he and Petitioner were "very close friends," he was aware of the charges against

Petitioner, and he understood the significance of the information he possessed relative to those charges. Paper No. 11, Ex. 5, Tr. at pp. 11-16. Therefore, it is arguable that the foundational elements were satisfied by Lee's own testimony. The post-conviction court correctly concluded that any objection by Calhoun would have served little purpose; rather, it would have required the State's Attorney to engage in additional preliminary questioning. In any event, there is no showing that the admission of the "impeachment" evidence materially affected the jury's verdict. The post-conviction decision shall not be overturned.

Petitioner next argues that defense counsel failed to request jury instructions on alibi and conspiracy. These claims were raised on post-conviction review and rejected. The post-conviction court determined that:

> The petitioner argues that trial counsel was ineffective in failing to request a jury instruction for conspiracy to commit murder and an instruction for an alibi defense. The instruction on alibi provides:
>
>> Evidence has been introduced that the defendant was not there when the crime was committed. You should consider this evidence along with all other evidence in this case. Thus, in order to convict the defendant, the State must prove, beyond a reasonable doubt, that the crime was committed and the defendant committed it.
>
> Maryland Pattern Jury Inst. Crim. §5.00: Alibi. It is apparent that the instruction on alibi does not include additional guidance to the jury that was not discussed in other instructions. For example, the jury was instructed that the State was bound to prove petitioner's presence at the scene. Trial Transcript, p. 39, June 20, 2003. The trial court also instructed the jury that the State is required to establish guilt or innocence beyond a reasonable doubt. Furthermore, Mr. Calhoun presented to the jury evidence of alibi during trial.
>
> Counsel's failure to request jury instructions on the alibi defense and conspiracy, although deficient, does not meet the prejudice prong of the *Strickland* test under the circumstances of this case. To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." *Harris v. State*, 303 Md. 685, 700 (1985). Normally, it would be the prosecutor who would request a conspiracy instruction to

14

support that count going to the jury. Thus, it is not clear that defense counsel had such an obligation. Moreover, the abundance of evidence of Petitioner's guilt in this case would have produced the same verdict. Indeed, the Court of Special Appeals made the same finding in determining that the failure to request an instruction on conspiracy and alibi were harmless error. It discussed the overwhelming evidence against petitioner, including the State's witness, Kenny Hopewell who had known the victim for 20 years and who visited Mr. Pope the night of the murder and left Mr. Pope that evening in the company of petitioner and Mr. Evans. *Razzaq v. State*, unreported, No. 1675, September 2003, decided Oct. 28, 2005, at pp. 15-17. The court also referred to the state's witness, Erica Singletary who was Mr. Pope's girlfriend. She testified that when she left Mr. Pope's house to go to a party and called Mr. Pope to inform him that she arrived at the party safely, she learned that Mr. Evans and petitioner were still at Mr. Pope's house. The same night, Ms. Singletary returned to Mr. Pope's house and found him murdered. The Court of Special Appeals also stated that Mr. Evans confirmed that Ms. Singletary was at the house with Mr. Pope when Evans and petitioner arrived and that Mr. Hopewell also showed up at Pope's house for a brief period. Evans' testimony of the chain of events of the evening in question was consistent with the testimony of Mr. Hopewell and Ms. Singletary. Lastly, the court discussed the testimony of Mr. Evans as to how the murder was committed. Mr. Evans described that he and petitioner planned to buy drugs from Mr. Pope and then to rob him. Petitioner gave a signal and Evans shot Pope in the back of the head. Subsequently, Evans removed a handgun from Pope's pocket and handed it to petitioner who then fired two rounds into the victim. Evans stated that he and petitioner fled through the back of the residence with the money, drugs, and Pope's handgun. According to Evans, to exit the house, they opened the rear sliding door and kicked out the screen. When Ms. Singletary returned to the house that evening, she testified at trial that it was precisely in this manner that she recalled that the back door was open. The Court of Special Appeals concluded its analysis by stating that "the evidence of Razzaq's guilt in this case is stark. There is no sound basis, on this record, that moves us to exercise our discretion to note plain error." *Id.* at 17. The failure to request the jury instructions, viewed in this context, does not amount to ineffective assistance of counsel.

Paper No. 11, Ex. 20, Tr. at pp. 11-13.

The decision shall not be overturned. Petitioner has failed to show how the outcome of his trial would have been different had the trial court instructed the jury on both conspiracy and alibi. First, the state, not the defense, should have pursued the conspiracy instruction. It is arguable that defense counsel had no obligation to do so and his silence placed Petitioner in an improved position with regard to the jury's deliberations. Regardless, the conspiracy verdict was determined by the

jury, which heard all testimony and in particular chose to believe Evans's testimony that he and Petitioner agreed to participate in the robbery and murder of the victim.[12]

In addition, the state court decision with regard to the alibi instruction shall not be disturbed. Judge Matricciani found that the absence of the alibi instruction did not affect the result of the case because Petitioner was not precluded from presenting his defense theory to the jury through evidence and closing argument, which was done. The trial transcripts show that defense counsel clearly presented an alibi defense through the introduction of hotel receipts and notes, the cross-examination of Andrea Moore, the direct testimony of defense witnesses Keith Lee and Lila Stewart, and closing argument to raise a reasonable doubt that that Petitioner was at the scene of the crime but was in fact somewhere else when the crimes were committed. Paper No. 11, Ex. 3, Tr. at pp. 205-213; Ex. 4 at pp. 225-227; Ex. 5, Tr. at pp. 10-11, 21-24, 71-76, & 90-91. In sum, Petitioner has failed to show how the absence of an alibi instruction prejudiced his case.

Petitioner next complains that defense counsel failed to impeach, object to and present evidence and witnesses. Although he does not delineate this bald claim, Petitioner presumably is echoing the post-conviction ground going to counsel's alleged failure to unearth and utilize facts to impeach the testimony of Xavier Evans. In denying post-conviction relief, the post-conviction court found as follows:

> Petitioner states that trial counsel failed to investigate the testimony of the state's key witness, Xavier Evans, and to impeach his testimony. The Court finds that this allegation is frivolous. First, Mr. Calhoun subpoenaed all the jail records of Xavier

---

[12]     As previously noted, Petitioner raised these issues as independent constitutional claims on direct appeal. The Court of Special Appeals found that instructional errors in the case were more appropriately subject to harmless error review and found that there was "no sound basis, on this record, that moves us to exercise our discretion to note plain error." Paper No. 11, Ex. 11 at p. 15-18. The appellate court concluded that the failure to issue such instructions was harmless error in light of the "abundant" and "stark" evidence of Petitioner's guilt.

Evans concerning visits and transportation to and from jail involving his conversations with the investigating detectives. Trial Transcripts, p. 7, June 19, 2003. Second, Mr. Calhoun tried to impeach Mr. Evans on cross examination by pointing out to the jury inconsistencies in each statement he gave to the police:

> Mr. Calhoun: That was your first statement. That statement was given around 6:30 at night after you had been in custody since a raid on your house... You're in homicide from 11:00 until to almost 6:00 or 7:00 in the evening and then you give a statement and in the statement you put everything on my client...
>
> Mr. Evans: Yes.
>
> Mr. Calhoun: Now you come back later in February and it's either on the date of February 28 or 29th and give a second statement to the police, is that right?
>
> Mr. Evans: Yes
>
> Mr. Calhoun: What led you to give a second statement to the police
> around a week later?.... What did they tell you? They obviously weren't satisfied with your first statement, right?
>
> Mr. Evans: Right.

Trial Transcript, pp.173-175, June 18, 2003.

> Mr. Calhoun: In the third statement, and again you talked about Karim, my client, carrying a .45, right? And you said it was a revolver, right?
>
> Mr. Evans: Yes.
>
> Mr. Calhoun: March 15th is the first time that you acknowledge that it was a fake weapon. You told them specifically that it was a fake .45, right?
>
> Mr. Evans: Yes
>
> Mr. Calhoun: That's the first time that you told the police that you carried a small gun that night; you carried a small gun in your pocket, right?

> Mr. Evans: Yes.

*Id.* at p. 178. Next, Mr. Calhoun pointed out the motive for Mr. Evans to implicate petitioner was to get a shorter sentence pursuant to his plea agreement:

> Mr. Calhoun: So what happens to you if you don't testify against my client?
>
> Mr. Evans: I get found guilty.
>
> Mr. Calhoun: What sentence to do you get?
>
> Mr. Evans: Life.
>
> Mr. Calhoun: Your Honor, I want to pre-mark Defense Exhibit No. 2.....
>
> Mr. Calhoun: What does this plea agreement say with regard to testimony against Mr. Razzaq?
>
> Mr. Evans: Life, all suspended but 20 years.
>
> Mr. Calhoun: What does this say if you fail to complete each and every obligation under this agreement?
>
> Mr. Evans: The State will revoke the deal.
>
> Mr. Calhoun: What kind of sentence will you receive?
>
> Mr. Evans: Two consecutive life sentences.

Trial Transcript, pp. 190-192, June 18, 2003. During his closing arguments, Mr. Calhoun summarized the inconsistencies of Mr. Evans' statements to the police and underscored that the reason he implicated petitioner was to avoid life in prison. Mr. Calhoun told the jury:

> The one thing I remember about Xavier Evans, and I don't think you'll ever forget it–he said several times, I gotta take the deal. I gotta take the deal....They gave me this deal... And this is a deal. You will get 20 years with 5 years–he'll get life in prison, suspend all but 20 years–20 years and 5 years probation.....And if he didn't testify against my client, do you know what his sentence would be? If he didn't testify against my client he would be sentenced to consecutive

> life terms....How much pressure is consecutive life sentences to testify?
>
> Trial Transcript, pp. 86-90. Accordingly, the trial transcripts reveal that Mr. Calhoun investigated the state's key witness, Mr. Evans, and attempted to impeach him for inconsistencies and possible inaccuracies in his testimony.

Paper No. 11, Ex. 20 at pp. 8-11.

The state court's findings of fact are presumptively correct. *See* 28 U.S.C. § 2254(e)(1). The trial transcript demonstrates that defense counsel Xavier Evans throughout the course of his cross-examination by addressing his criminal history, his involvement with Craig Pope's former girlfriend and Petitioner's sister Barbara Gibbs, the veracity of his many statements to police officers, and his self-interest in testifying against Petitioner for a reduced sentence Paper No. 11, Ex. 3, Tr. at pp. 158-186 & 188-194. Thus laying the foundation, he argued on closing that Evans's explanation of the events leading up to and including the murder was inconsistent, incredible, and improbable. That the jury decided to find Evans's testimony credible and convict Petitioner does not mean that Calhoun's impeachment of Evans was constitutionally inadequate.

Petitioner next complains that Calhoun failed to investigate the case and present a defense. The exact contention was raised on post-conviction review and found to be meritless by Judge Matricciani under the following rationale:

> Petitioner raises four arguments as part of this allegation: 1. counsel was ineffective in failing to investigate the crime scene and failing to call witnesses who would discuss the physical evidence of the crime scene in an effort to contradict the testimony of codefendant Xavier Evans; 2. counsel was ineffective in failing to cross examine the state's witnesses regarding the discrepancies of Mr. Evans' testimony and the physical evidence; 3. counsel was ineffective in failing to investigation the whereabouts of Mr. Evans on the night of the murder of Mr. Pope; and 4. counsel was ineffective in failing to collect evidence for petitioner's alibi defense. Petitioner argues that had trial counsel investigated the crime scene, he would have noticed that Evans' trial testimony was not consistent with the physical evidence. Mr. Evans

testified that he shot the victim in the back of the head in the living room once and then as the victim fell to his knees, petitioner placed his body face up against the sofa and shot him two additional times. Trial Transcript, pp.144-146, June 18, 2003. Petitioner argues that trial counsel should have presented witnesses who could demonstrate to the jury that the physical evidence of the crime scene was not consistent with Mr. Evans' testimony regarding the manner in which the murder of Mr. Pope was committed. For example, during the post conviction hearing, Dr. Callory, an expert witness in forensic pathology, testified that the bullets and blood should have been found in the room where the victim was shot, especially in the vicinity of the sofa. Instead, Dr. Callory stated that the photos of the crime scene showed that the bullets and shell casings were found in the hallway. A wall separates the room where Mr. Pope was allegedly shot and the hallway where the bullets and shell casings were found. Testimony of Dr. Richard T.  Callory, Feb. 5, 2007.

Mr. Calhoun's failure to present such expert testimony at trial is not sufficient to establish ineffective assistance of counsel. In determining the type of conduct that is deemed to be deficient, courts have held that counsel is not required to pursue all possible defense strategies. *Love v. State*, 95 Md. App. 420, 436 (1993). Counsel's acts or omissions must be "outside the wide range of professionally competent assistance" in order to be considered deficient. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Absent evidence to show that trial counsel acted improperly, the presumption is that counsel conducted proper investigation. *Cirincione v. State*, 10 Md. App. 545 (1970). The Court acknowledges that Mr. Calhoun could have pursued a more effective defense strategy for his client. Mr. Calhoun did, however, comply with the minimal requirements for effective assistance of counsel propounded by *Strickland* (stating that for counsel to be deficient, a showing is required that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment." *Strickland*, 466 U.S. at 687). The *Strickland* standard does not require trial counsel to call expert witnesses at trial. *See Id.* at 681. Accordingly, the Court is unwilling to conclude that trial counsel's performance in this regard was constitutionally deficient.

Next, petitioner argues that, had Mr. Calhoun investigated the crime scene, he would have demonstrated to the jury during his cross examination of state witnesses that Mr. Evans could not be possibly telling the truth. A review of the transcripts reveals that Mr. Calhoun was familiar with the crime scene. On cross examination of Technician Havrilla, Mr. Calhoun pointed out to the jury that there were no bullets or shell casings found near the body or on the sofa.

Mr. Calhoun: Describe the fire place.

Ms. Havrilla: I wouldn't remember exactly without seeing a picture. I do know that the hearth was only maybe a half inch off the floor, it wasn't very high....

Mr. Calhoun: Where exactly on the hearth was the shell casing found?

Ms. Havrilla: It was towards the front approximately in the middle of the hearth.

Mr. Calhoun: How far is it from the front of the hearth to the sofa (location of the body)?....

Ms. Havrilla: its looks about approximately 12 feet.

Trial Transcript, pp.. 58-60, June 18, 2003. It is not the function of this Court to measure the effectiveness of any given cross-examination unless it is so deficient as to affect the outcome of the case. Petitioner's criticism here of Mr. Calhoun's efforts is an insufficient basis for the Court to conclude that counsel's performance was not reasonable under the prevailing professional norms. *Bowers v. State*, 320 Md. 416, 424 (1990).

Petitioner alleges that trial counsel was ineffective in failing to investigate whether Mr. Evans actually witnessed the murder of Mr. Pope. Petitioner argues that police records show that Mr. Evans was caught in a club raid on the same night and time he allegedly witnessed petitioner shoot the victim. Petitioner explained at the post conviction hearing that during raids, all customers of the club are ordered by the police to line up outside and the police subsequently record everyone's name. The petitioner also argues that the club has cameras that would have revealed that Mr. Evans was there at the time that he stated that he witnessed petitioner shoot Mr. Pope. The Court finds that this allegation is without merit. First, there is no indication that petitioner informed Mr. Calhoun during the trial that such evidence existed. Second, Mr. Evans admitted to committing the crime with petitioner, which logically placed him at the crime scene at the same time. Trial Transcript, Testimony of Xavier Evans, June 18, 2003. Consequently, trial counsel was not deficient in failing to investigate the whereabouts of Mr. Evans under the totality of the circumstances.

Petitioner also argues that trial counsel was ineffective for failing to establish an alibi defense by obtaining hotel records showing that petitioner was there on the night in question. This allegation is frivolous because the trial transcripts reveal that Mr. Calhoun subpoenaed the hotel receipts showing Mr. Razaaq stayed at the Days Inn Motel on the night of February 9th when Mr. Pope was killed. These receipts became exhibits entered into evidence by the defendant. Trial Transcript, pp. 225-227, June 19, 2003. Petitioner argues that counsel should have called as a witness the hotel clerk who would have testified to seeing Mr. Razaaq at the hotel on the night in question. In addition to the exhibits cited above, other receipts showing the same information were also found in Mr. Razaaq's bag. These receipts were entered into

evidence at trial as defendant's exhibit no. 5. Trial Transcript, p. 208, June 19, 2003. Accordingly, Mr. Calhoun acted reasonably in collecting hotel receipts for his client's alibi defense. There was no evidence presented at the post conviction hearing that the hotel clerk actually recalled seeing the petitioner on the night in question. Therefore, it is at best speculation as to what the clerk actually saw on the night of the murder. *See Strickland*, 466 U.S. at 689 (stating that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.").

Paper No. 11, Ex. 20 at pp. 4-8

The Court finds no reason to disturb this ruling. After exhaustive review of the trial transcripts the undersigned finds that Petitioner has failed to show that defense counsel conducted an inadequate investigation or was unprepared for trial. Rather, Calhoun strongly challenged the State's case in an attempt to impeach Evans's testimony with regard to prior false statements and inconsistencies in and motivations for his statements. Calhoun also produced alibi testimony regarding Petitioner's whereabouts at the time of Pope's murder. Judge Matricciani's rulings as to these grounds involved a reasonable application of *Strickland*.

### Prosecutorial Misconduct

Petitioner argues that State's Attorney Pickus engaged in misconduct by making remarks in closing argument not supported by the record evidence. In his post-conviction petition, Petitioner claimed that Pickus made unsupported claims during closing argument. Judge Matricciani found no merit to the claim, concluding that:

Generally, a petitioner maybe entitled to a new trial if he can show that the prosecutorial misconduct deprived petitioner of a fair trial, resulting in denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). However, if the act of misconduct was known during the trial, the defendant must make an objection at the trial to preserve raising the issue for post conviction. *State v. Ticknell*, 403 Md. 428, 464 (1986). Similarly, if petitioner fails to raise an allegation of prosecutorial misconduct on appeal, he may not raise it on post conviction. *Bailey v. United States*

*of America*, F.Supp. 2d, 2003 WL 24901468 at 2 (2003). However, the petitioner may raise an allegation of prosecutorial misconduct in a post conviction proceeding, if the petitioner shows that he/she was not aware of the prosecutorial misconduct during the trial, as is commonly the case with *Brady* violations. *See Conyers v. State*, 367 Md. 571, 596 (2002). The Court will deny petitioner's allegations of prosecutorial misconduct for the reasons set forth below.

This allegation is also without merit for the reasons stated in the Court of Special Appeals' opinion. *Razzaq v. State*, unreported, No. 1675, September 2003, decided Oct. 28, 2005, at pp. 18-22. Although, petitioner framed the allegation on direct appeal as that of the trial court abusing its discretion in denying defense's motion for mistrial, the appellate court discussed the possible misconduct of the prosecutor. The misconduct that petitioner refers to is the prosecutor's reference during closing argument to an abduction report of the petitioner that was never in the record:

> Mr. Pickus: The physical evidence doesn't lie. It completely corroborates everything Xavier Evans said. But since we're lucky enough to hear from the defendant through his prior statements, let's take a closer look at that. First of all, how do we even get the defendant talking to the police? He makes some kind of abduction –
>
> Mr. Calhoun: Objection. Objection.
>
> The Court: Approach.
>
> Mr. Calhoun: Your, Honor, there's no evidence in this case that my
>
> client made any abduction report. Move for mistrial or jury instruction.
>
> The Court: I'll hear from you.
>
> Mr. Pickus: There was. Detective Massey testified that he filed a report that he unsubstantiated. I thought he used the word abduction.
>
> Mr. Calhoun: I am pretty sure he didn't say that.
>
> Mr. Pickus: I know he used the word abduction. I thought that's the
>
> word detective Massey used.
>
> The Court: sustain the objection- request for mistrial...

> The Court: Ladies and gentlemen, I am sustaining the objection. There is no such evidence before this Court as to an abduction report. There was discussion and evidence as to receiving information, which the detective found unsubstantiated, but no such evidence as such. Please disregard the comment as made by counsel.
>
> Mr. Pickus: I apologize to your Honor. I apologize to you ladies and gentlemen of the jury.

Trial Transcript, pp. 103-104, June 20, 2003.

The Court of Special Appeals determined that the prosecutor's remarks were not prejudicial to Mr. Razzaq. The Court of Special Appeals stated the following in reaching this holding:

> The steps taken by the trial court further undermine that any prejudice that flowed from the closing requires reversal. The...alleged instance of improper closing argument prompted an immediate curative instruction as requested by counsel, as well as an equally forthright apology from the prosecutor.

*Razzaq v. State*, unreported, No. 1675, September 2003, decided Oct. 28, 2005, at p. 21. The Court finds that this allegation has been reviewed and decided by the Court of Special Appeals. Petitioner's attempt to raise it with a different twist on post conviction is without merit.

Paper No. 11, Ex. 20 at pp. 15-17.

Judge Matricciani's decision was not an unreasonable application of Supreme Court law. The Court finds no prejudicial misconduct on the part of the prosecutor that unlawfully burdened Petitioner' rights and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986); *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010). In the Fourth Circuit, in order to reverse a conviction based upon prosecutorial misconduct, "the defendant must show (1) 'that the prosecutor's remarks or conduct were improper' and (2) 'that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial.'" *Caro*, 597 F.3d at 624-25. Given the

immediate curative instruction issued by Judge Nance, there was nothing in the prosecutor's comments that distorted the jury's ability to reach a fair decision based on all the evidence presented at trial.

**Effectiveness of Post-Conviction Counsel**

Petitioner claims that post-conviction counsel was ineffective due to her failure to subpoena witnesses on collateral review. Such a claim implicates the issue of this Court's subject matter jurisdiction under 28 U.S.C. § 2254. Errors or defects in state post-conviction proceedings do not raise constitutional questions cognizable in federal habeas corpus proceedings. *See Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988); *see also Williams-Bey v. Trickey,* 894 F.2d 314, 317 (8th Cir. 1990); *Kenley v. Bowersox*, 228 F.3d 934, 938-39 (8th Cir. 2000); *Zamora v. Pierson*, 158 F.Supp.2d 830, 836 (N.D. Ill. 2001).

## <u>Conclusion</u>

The instant Petition for habeas corpus relief will be denied, and this case will be dismissed by separate Order. When a district court dismisses a habeas petition, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-el v.*

*Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983).

Petitioner does not satisfy this standard, and the Court declines to issue a certificate of appealability.


                                              /s/
                                            PETER J. MESSITTE
October 14, 2010                        UNITED STATES DISTRICT JUDGE